## Fogel v. Fogel, Appellant.

Argued March 12, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Lemuel B. Schofield,* with him *Marvin Comisky* and *W. Bradley Ward,* for appellant.

*George H. Detweiler,* with him *Emanuel W. Beloff,* for appellee.

OPINION BY ARNOLD, J., September 30, 1947:

The wife-respondent appeals from a decree in divorce granted by the court below after its independent examination of the record. The master had recommended such a decree on the grounds of indignities and cruel and barbarous treatment, after twenty-five meetings for the taking of testimony, producing a record of 1386 pages.

The libellant was admitted to the bar in 1922 and became an active practitioner. The parties were married in 1925 and a son was born on April 20, 1929.

The libellant, allegedly because of her conduct, left the respondent in 1934 and remained away for approximately a year. He averred that the conduct of which he complains in the instant libel was the same sort of conduct which necessitated his leaving her in 1934. He returned during the year 1935 and claims that her conduct again compelled his leaving on November 13, 1944, after which this libel was filed, and the parties remained separated. The boy, now past sixteen, spends the weekends with his mother but lives the rest of the time with his father. Since the final separation the libellant has generously supported his wife in what had been their common home, given to her by her father (subject to an encumbrance which the libellant had reduced), but which had been placed in both their names for financing purposes. The libellant does not claim any interest in this real estate.

Within the length of an opinion it is difficult to epitomize this vast record. The testimony on behalf of the libellant was that the wife applied insolent, con-

temptuous epithets to him;[1] referred to his family in most insulting terms;[2] constantly belittled him as a man and a lawyer; continually said that she hated him, and that he was stingy and did not give her as valuable gifts as other husbands gave their wives; claimed that he was intimate with and supported other women;[3] refused to entertain his friends or clients or their boy's companions; repeatedly struck him, scratched his face, tore his clothes, hit him with a pole; and that her conduct in their intimate relations (which we will not narrate) seriously affected his health. This is but a brief resume reflecting but the high lights of her behavior.

The libellant testified to these things with great detail, and that they were of almost daily occurrence during his whole married life. A considerable number of other instances of the wife's malignity were also testified to, but need not be detailed here.

It is impossible for anyone to deny that, if the husband's recital of the events of his married life was true, he would be entitled to a divorce. Even the respondent-appellant does not so contend, but only asserts that the husband and his witnesses should be disbelieved; that the wife and her witnesses should be accredited; and that there was insufficient or no corroboration of the libellant.

The libellant's testimony is that his wife always behaved properly in public but reserved her harsh ill-treatment until they were alone, or on some occasions in the presence of their boy. The libellant's testimony is consistent, quite persuasive and unshaken. It was

---

[1] Louse, dog, long-nose, dirty baldhead, fat slob, ugly bastard, lousy dog, bitch, tightwad and other epithets.

[2] Constantly called attention to a relative who was mentally afflicted; referred to his mother as immoral and the cause of the suicide of her second husband's first wife; allegations that libellant, through influence, obtained favors from the army for his brother; and generally that his whole family was "no good."

[3] Respondent offered no evidence on this but denied saying it.

corroborated in a number of particulars,[4] although a great deal of it could not be, because the wife rarely misconducted herself in the presence of witnesses. But a divorce may be granted on the libellant's uncorroborated testimony, though the court will scrutinize it with extreme care (as we have done herein) : *Tobin v. Tobin,* 60 Pa. Superior Ct. 476; *Mitchell v. Mitchell,* 142 Pa. Superior Ct. 599, 16 A. 2d 725; *Briggs v. Briggs,* 145 Pa. Superior Ct. 460, 21 A. 2d 415; *Friess v. Friess,* 156 Pa. Superior Ct. 38, 39 A. 2d 151. See the often reiterated rule in *Jones v. Jones,* 160 Pa. Superior Ct. 358, 51 A. 2d 521: ". . . before that . . . rule [that where the libellant's testimony is without corroboration and is contradicted by respondent, there is nothing but a doubtful balance of evidence] can be made to apply, it must appear that libellant's testimony was not only contradicted but shaken by the respondent." The respondent denied each allegation, and alleged that the epithetic and bad language which he attributed to her was in fact the language which libellant used toward her; and that nagging and ill temper were traits exclusively possessed by him. All through her testimony she brought in that he was stingy, buying neither anything for the house nor for her. When forced to admit purchases by him, she stated that they "were bought at wholesale." She alleged that her conduct was always exemplary toward both husband and son; that she was subjected to daily humiliations by him, and almost daily

---

[4] Mary E. Hudson, who heard the wife call her husband a dirty louse and bastard at various times, and heard other insults offered him. She worked in the household 1931-34.

Christina L. Franczen, a nurse in the house for two weeks, as to the nagging of the husband by the wife in the presence of the son, and to calling the husband a louse.

Olive Waller, who worked in the house for some three months, as to improper conduct, and calling her husband an idiot and a long nose.

Corroboration of certain of the particulars was also given by A. Benjamin Wilkes and other witnesses.

epithets of insult and scorn; that he constantly repulsed her demonstrations of affection, and that throughout their married life he repeatedly told her that he hated her. She then stated that she had the greatest admiration and love for her husband, and that the only reason she contested the action was because of this deep affection.[5] Her testimony has many inconsistencies. It is difficult to believe that any woman subjected to the indignities which she alleges, and who, in addition, had heaped upon her innocent head the charges made in her husband's testimony, would still love him,—the author of all her woes; a husband who left her for nearly a year, and left permanently in 1944, and who, according to her, deserted her for short periods frequently throughout their married life. On this the master said that "her statements of love, admiration and devotion cannot be accepted at their face value." This is probably an understatement.

The respondent having denied that she ever called her husband the names referred to, or threatened (as he alleged) to commit suicide, or sought to humiliate him or make him unhappy, on cross examination was faced with a note which she admitted was in her handwriting. It was not addressed to any person. The libellant testified that this note was placed in a prominent position in the kitchen, and that their house was occupied only by the husband, the wife, their boy and a maid. She testified that she remembered nothing at all about it, and could give no explanation as to the person for whom it was intended, but she claimed that it was not intended for him and had no reference to him. This note,[6] in part, stated: "My [respondent's] refusing to go with you applies not only to today but also to next Sunday *especially*"; and "God shall kill me before I ever do

---

[5] There was evidence from her witness, Wilkes, which showed, at least inferentially, that she would not live with him again, that she contested the case for "satisfaction", and would later divorce him and wanted a cash settlement (N.T. 1283-1284).

[6] N.T. 1232.

what you want"; and "I'll give you today's and yesterday's medicine, only a heavier dose"; and "I'll eat your heart out just as mine has been eaten. Remember dog, I'm not joining you next Sunday . . . You lousy dog."

As to the stinginess of her husband, her own evidence shows that he allowed her $40 a week for the house and clothing for herself and the boy, which was increased to $45, to $50, to $55, to $60. She always kept a maid. He claimed that he bought many other things such as food, meals, clothing, presents and furnishings, and that he got her a fur coat. To contradict this she averred that she paid $600 on the coat and that he only paid $150. She then said that she *saved* this out of her housekeeping money. She also claimed that she financed various vacations out of *savings*. She gave estimates of his earnings as being $20,000 to $25,000 per year. At the time she testified, there had been furnished to her and her counsel his income tax reports which showed from $5000 to $6000 per annum. The husband's bill of particulars alleged that one evening she scratched his face, producing two long and bleeding marks. He so testified and produced a photograph. This was undoubtedly his picture and the marks undoubtedly were there. He alleged that he had been in the midst of a trial, and that he had to appear in court the next morning with this disfigurement. He was corroborated by his client in that trial. In spite of the libellant's testimony, the client's testimony, and the photograph, the respondent said that she had no knowledge or recollection of his face ever having had scratches on it.[7]

The parties agreed that neither would call their son as a witness to alleged improper conduct of the other party. The master stated that he felt strongly that this boy ought not to be placed in that position. This agreement was faithfully kept. However, the respondent denied the husband's statement that she refused to allow him or the son to have friends in the house, and as her

[7] N.T. 695, 810.

corroborating witness called a boy about her son's age, who testified to having had dinner with the son and his parents. In rebuttal the son was called and testified that no such event had ever taken place, and that the witness had never had a family meal with them. The respondent's cross examination sought to develop that such an instance might have occurred without the boy recalling it, and then came his devastating answer: *"People came so infrequently* [to the house] *that I remembered when they did come."* [8] (Emphasis supplied.) She was contradicted by telephone records as to her testimony that the libellant did not speak to her when their son was ill. She was contradicted in her allegation that she never consulted a psychiatrist (in company with her husband) with regard to her rages and temper; the contradiction being by the doctor whom she consulted.

She called six witnesses for "corroboration", but they only testified to her conduct in public, which was not in dispute. On actual corroboration she called her mother, her sister and her brother. We agree with the master that their testimony was prejudiced in her favor, although the brother and sister did in certain respects corroborate the libellant.

The credible evidence as to her conduct showed respondent's studious application toward his humiliation and degradation. Habitual contumely, studied neglect, disdain, abusive language, settled hate and estrangement are apparent. The clear weight of the testimony, of the quality required, is with the libellant; and the respondent's testimony is far from convincing and does not give the true picture of their married life. Her conduct undoubtedly rendered his condition intolerable and his life burdensome. He is entitled to a decree.

Decree affirmed.

---

[8] N.T. 1374.